[S.F. No. 24618. Apr. 29, 1985.]

GEORGE BECKER, Plaintiff and Appellant, v.
IRM CORPORATION, Defendant and Respondent.

COUNSEL

Meyer & Mitchell and Jack P. Dougherty for Plaintiff and Appellant.

Leonard Sacks, Edwin Train Caldwell, McNamara, Houston, Dodge, McClure & Ney and Edward Kelly Shinnick as Amici Curiae on behalf of Plaintiff and Appellant.

John P. Caudle, Robert W. Brower and Kincaid, Gianunzio, Caudle & Hubert for Defendant and Respondent.

Rogers, Joseph, O'Donnell & Quinn, Joseph W. Rogers, Jr., Nance F. Becker and Jon D. Smock as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**BROUSSARD, J.**—In this personal injury action plaintiff's complaint asserted causes of action of strict liability and negligence against defendant landlord. Defendant moved for summary judgment urging that a landlord is not liable to a tenant for a latent defect of the rented premises absent concealment of a known danger or an expressed contractual or statutory duty to repair. The trial court granted the motion and denied a motion for reconsideration. Plaintiff appeals.[1]

We have concluded that the trial court erred as to both causes of action.

The complaint alleged that plaintiff was injured when he slipped and fell against the frosted glass shower door in the apartment he leased from defendant. The door was made of untempered glass. It broke and severely lacerated his arm. It is undisputed that the risk of serious injury would have been substantially reduced if the shower door had been made of tempered glass rather than untempered glass.

Defendant's affidavits in support of the motion for summary judgment may be summarized as follows: Plaintiff's apartment is part of a 36-unit apartment complex built in 1962 and 1963 and acquired by defendant in

---

[1]We have been advised that while the case was pending in this court plaintiff settled with the builder and a door assembler and installer for $150,000 plus $50,000 in the event plaintiff is unsuccessful against the remaining defendants. Apparently, the case remains pending in the trial court against a component part supplier. Defendant landlord will be referred to as defendant herein.

1974. Prior to the acquisition, two officers of defendant walked through most of the apartments and observed that all of the shower doors were of frosted glass and appeared to be the same. The officials, one of whom managed the property from the time of its acquisition, stated that prior to plaintiff's accident in 1978 there were no accidents involving the shower doors and that they were not advised that any of the shower doors were made of untempered glass. They first learned that some of the shower doors were of untempered glass after the accident. Their inspection of shower doors after the accident provided "no visible difference between the tempered and untempered glass in terms of visible appearance."

Defendant's maintenance man stated that after the accident he examined the glass doors, and that 31 of the doors with untempered glass were replaced by him. He also stated that in looking for the untempered glass shower doors "there was no way that a layperson could tell any difference by simply looking at the shower doors. The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass."

Plaintiff did not file affidavits in opposition to defendant's.

■ The summary judgment procedure is drastic and should be used with caution so that it will not become a substitute for a full trial. A summary judgment is proper only if the affidavits of the moving party would be sufficient to support a judgment in his favor and doubts as to the merits of the motion should be resolved in favor of the party opposing the motion. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

## STRICT LIABILITY

■ In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], we established the rule: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. [Citations.]" The court recognized that the cases imposing strict liability had "usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff." (59 Cal.2d at p. 63.) The justification for departing from warranty theory and for establishing a doctrine of strict liability in tort was the recognition that the

liability was imposed by law and the refusal to permit the manufacturer to define the scope of its own liability for defective products. (*Ibid.*)

Our concern was not that warranty law failed to adequately define the manufacturer's duty but that the " ' 'intricacies of the law of sales' " applicable to commercial transactions might defeat the obvious representation of safety for intended use made by the manufacturer. (*Id.*, at pp. 63-64.) In declining to discuss the basis of the strict liability, *Greenman* pointed out that the basis of it had been fully articulated, citing to the classical concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436]. (*Id.*, at p. 63.) In the concurring opinion in *Escola*, Justice Traynor pointed out: "The retailer, even though not equipped to test a product, is under an absolute liability to his customer, for the implied warranties of fitness for proposed use and merchantable quality include a warranty of safety of the product. [Citations.]" (24 Cal.2d at p. 464.) It was also pointed out that the retailer should not bear the burden of his warranty alone but that he could recoup any losses by means of the warranty of safety attending the wholesaler's or manufacturer's sale to him. (*Ibid.*)

*Greenman* also noted that the purpose of strict liability in tort is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (59 Cal.2d at p. 63; see *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 732-733, 736 [144 Cal.Rptr. 380, 575 P.2d 1162].)

We follow a stream of commerce approach to strict liability in tort and extend liability to all those who are part of the "overall producing and marketing enterprise that should bear the cost of injuries from defective products." (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 et seq. [37 Cal.Rptr. 896, 391 P.2d 168].) The doctrine of strict liability in tort has been applied not only to manufacturers but to the various links in the commercial marketing chain including a retailer (*id.*), a wholesale-retail distributor (*Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 251 et seq. [71 Cal.Rptr. 306]), personal property lessors and bailors (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251-253 [85 Cal.Rptr. 178, 466 P.2d 722]), and a licensor of personalty (*Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319, 324-326 [82 Cal.Rptr. 420]). In holding that strict liability in tort was applicable to lessors and bailors in *Price* v. *Shell Oil Co.*, *supra*, 2 Cal.3d at page 254, it was pointed out that strict liability does not apply to isolated transactions such as the sale of a single lot.

Application of warranty doctrine has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those

engaged in the real estate business. Traditionally, the courts applied the doctrine of caveat emptor with the buyer assuming the risk on quality unless there was express warranty, fraud or misrepresentation. (E.g., *Gustafson* v. *Dunman, Inc.* (1962) 204 Cal.App.2d 10, 13 [22 Cal.Rptr. 161].)

However, the courts have recognized that a contract to build is in effect one of material and labor, that implied warranties are not limited to sales transactions, and that building contracts give rise to a warranty of merchantability and suitability for ordinary use. (*Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 580-583 [12 Cal.Rptr. 257, 360 P.2d 897]; *Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 378 [115 Cal.Rptr. 648, 525 P.2d 88]; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 626 [111 Cal.Rptr. 704, 517 P.2d 1168].) And in *Pollard* v. *Saxe & Yolles Dev. Co., supra,* 12 Cal.3d 374, 377-380, it was held that an implied warranty of quality attaches to the sale of new construction. The court pointed out that the doctrine of implied warranty in a sales contract is based on the actual and presumed knowledge of the seller, reliance on the seller's skill and judgment, and the ordinary expectations of the parties. The court reasoned that "the builder or seller of new construction—not unlike the manufacturer or merchandiser of personalty—makes implied representations, ordinarily indispensable to the sale, that the builder has used reasonable skill and judgment in constructing the building. On the other hand, the purchaser does not usually possess the knowledge of the builder and is unable to fully examine a completed house and its components without disturbing the finished product." (12 Cal.3d at p. 379.) The court concluded that "builders and sellers of new construction should be held to what is impliedly represented—that the completed structure was designed and constructed in a reasonably workmanlike manner." (*Id.* at p. 380.)

Similarly, application of strict liability in tort has not been limited to those engaged in commerce in personalty but has been applied where appropriate to those engaged in real estate businesses who impliedly represent the quality of their product. In *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749], a builder who mass-produced homes was held strictly liable when the heating system placed in a home failed. The court relied upon *Schipper* v. *Levitt & Sons, Inc.* (1965) 44 N.J. 70 [207 A.2d 314, 325-326], where the court pointed out that when in our modern society a person purchases a tract house from an advertised model, he relies upon the skill of the developer and the implied representation that the house will be erected in a reasonably workmanlike manner and reasonably fit for habitation, that the purchaser ordinarily does not have the means to protect himself either by hiring experts to supervise and inspect or by provision in the deed, and that the public interest dictates that the cost of injury from defects should be borne by the developer who created the danger

and who is in a better economic position to bear the loss rather than the injured party who relied on the developer's skill and implied representation. In *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 615 [77 Cal.Rptr. 633], it was held that a manufacturer of a residential lot may be held strictly liable in tort for damages suffered by the owner as the result of defect in the manufacturing process causing subsidence.

A similar development appears with respect to the landlord-tenant relationship. The earlier legal concepts regarded the lease as an equivalent to a sale of the premises for the term and under traditional common law rules the landlord owed no duty to place leased premises in a habitable condition and no obligation to repair absent an agreement. (*Green* v. *Superior Court* (1974) 10 Cal.3d 616, 622 [111 Cal.Rptr. 704, 517 P.2d 1168]; *McNally* v. *Ward* (1961) 192 Cal.App.2d 871, 878 [14 Cal.Rptr. 260].) "The common law placed the risk on the tenant as to whether the condition of the leased property made it unsuitable for the use contemplated by the parties. In recent years, the definite judicial trend has been in the direction of increasing the responsibility of the landlord, in the absence of a valid contrary agreement, to provide the tenant with property in a condition suitable for the use contemplated by the parties. This judicial trend has been supported by the statutes that deal with this problem. This judicial and statutory trend reflects a view that no one should be allowed or forced to live in unsafe and unhealthy housing." (Rest. 2d Property, Landlord and Tenant, ch. 5, introductory note, p. 150.)

The Restatement draws a distinction as to defective conditions in leased dwellings existing at the time of the lease and those arising thereafter. In the former situation the tenant may recover damages in the absence of lessor fault while in the latter damages are recoverable only if the landlord is at fault. (Compare *id.*, § 5.1, subd. (2)(a), pp. 168-169 with §§ 5.2, subd. (2)(a), p. 184, and 5.4, subd. (2)(a), pp. 194-195.)

Departures from the traditional common law rule applicable to landlords evolved in California both by statute and judicial decision. Civil Code section 1941 requires that the lessor of a building intended for use as a dwelling put it in fit condition for such use and repair all subsequent dilapidations. However, the tenant's remedies for violation of the statute are limited to the making of necessary repairs and deducting costs from one month's rent, or to abandon the premises with discharge from rental obligations. (Civ. Code, § 1942, subd. (a).) And the landlord's duty does not arise if the tenant has breached certain of his obligations relating to maintenance of the premises. (*Id.*, § 1941.2.) An agreement by the lessee waiving his rights under section 1941 is void as contrary to public policy except that the lessee

may agree as part of the rental to improve, repair, or maintain stipulated portions of the dwelling. (*Id.*, see § 1942.1.)

Pointing out that the traditional common law rule that the landlord had no duty to make the dwelling habitable arose in the agrarianism of the Middle Ages and is incompatible with contemporary social conditions and modern legal values, California courts have recognized that a lease for a dwelling contains an implied warranty of habitability. (*Hinson* v. *Delis* (1972) 26 Cal.App.3d 62, 68-71 [102 Cal.Rptr. 661]; *Green* v. *Superior Court, supra,* 10 Cal.3d 616, 622 et seq.; *Knight* v. *Hallsthammar* (1981) 29 Cal.3d 46, 51-53 [171 Cal.Rptr. 707, 623 P.2d 268].) In *Green,* the court reasoned that the typical city dweller leasing an apartment cannot realistically be viewed as merely acquiring an interest in land but rather contracts for a place to live, that modern apartment buildings are complex, difficult and expensive to repair and adequate inspection by tenants is a virtual impossibility, that repairs will often be outside the reach of abilities or finances of tenants, that the scarcity of adequate low-cost housing has left tenants with little bargaining power and rendered the common law remedies inadequate, and that the widespread enactment of comprehensive housing codes show that public policy compels landlords to bear "the primary responsibility for maintaining safe, clean and habitable housing in our state." (10 Cal.3d at pp. 623-628.)

*Green* analogized to the parallel dramatic changes in the law of commercial transactions where modern decisions have recognized that the consumer in an industrial society should be entitled to rely on the skill of the supplier to assure that goods and services are of adequate quality and, discarding the caveat emptor approach, have implied a warranty of merchantability and fitness. Pointing out that the modern urban tenant is in the same position as any normal consumer of goods, it was concluded that a tenant may reasonably expect that the product purchased is fit as a living unit and that since the lease specifies a term the tenant may reasonably expect that the premises will be fit for habitation for the term. (10 Cal.3d at p. 627.)

*Green* held that breach of the implied warranty of habitability may be urged as a defense in an unlawful detainer proceeding and that in such cases the court could determine that the breach warranted a partial or total reduction in rent. (10 Cal.3d at p. 631 et seq.) Neither *Green* nor our subsequent decision in *Knight* v. *Hallsthammar, supra,* 29 Cal.3d 46, discussed whether or to what extent breach of the implied warranty of habitability might provide a basis for recovery of tort damages for injuries caused by the breach.[2]

---

[2]As will appear, subsequent Court of Appeal cases have considered this issue.

Developments in the law of landlord liability for injuries due to defective condition of the demised premises have not lagged far behind. The traditional common law rule was that a landlord is not liable to the tenant for injuries due to a defective condition or faulty construction of the demised premises in the absence of fraud, concealment or covenant in the lease. (E.g., *Del Pino* v. *Gualtieri* (1968) 265 Cal.App.2d 912, 919-920 [71 Cal.Rptr. 716]; *Forrester* v. *Hoover Hotel & Inv. Co.* (1948) 87 Cal.App.2d 226, 232 [196 P.2d 825].) The rule was not only based on traditional property concepts and caveat emptor but also on the landlord's lack of possession and control. (E.g., *Brennan* v. *Cockrell Investments, Inc.* (1973) 35 Cal.App.3d 796, 799-801 [111 Cal.Rptr. 122].) A number of exceptions have developed to the rule of landlord nonliability—where the landlord voluntarily undertakes to repair, where the landlord had knowledge of defects, where a safety law was violated, where the landlord retained a part of the premises for common use, and where the lease was for a semipublic purpose. (3 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 2135-2136.)

Strict liability for the conditions of the demised premises has been applied to landlords. Prior to *Greenman,* it was held that where a landlord represented that a wall-bed was safe, secure and in fit condition at the time of the letting, the plaintiff could maintain an action based on the express warranty. (*Shattuck* v. *St. Francis Hotel & Apts.* (1936) 7 Cal.2d 358, 360-361 [60 P.2d 855].) Also, prior to *Greenman,* it was held that a lessee could recover for breach of an implied warranty of fitness for use when a door to which a folding bed was attached fell and injured him. (*Fisher* v. *Pennington* (1931) 116 Cal.App. 248, 249-251 [2 P.2d 518].) *Fisher* was followed in *Charleville* v. *Metropolitan Trust Co.* (1934) 136 Cal.App. 349, 355 [29 P.2d 241] which also involved a folding bed and *Hunter* v. *Freeman* (1951) 105 Cal.App.2d 129, 131 et seq. [233 P.2d 65], involving an explosion of a detachable heater. In all four cases, the accident occurred shortly after the tenant went into possession, and it was also held that the warranty liability was limited to "the condition of the premises at the beginning of the term and not to conditions which, unknown to the lessor, subsequently arise." (*Forrester* v. *Hoover Hotel & Inv. Co., supra,* 87 Cal.App.2d 226, 232 [196 P.2d 825].)[3] Each of the above cases involved a furnished apartment and the accident was arguably attributable to the furnishings as well as the condition of the demised premises.

---

[3]*Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 424 [282 P.2d 890], stated that *Forrester* and *Hunter* disapproved a statement in *Fisher* that the landlord of a furnished apartment warrants the safety of the premises and the furnishings to the same extent as an innkeeper. The citation to *Forrester* and *Hunter* reflects approval of the limited implied warranty recognized in the former case and applied in the latter of a warranty of the condition of the premises at the beginning of the term. Thus, *Stowe* should not be read as rejecting implied warranties by landlords generally but only the equation of such warranties to an innkeeper's warranties.

Subsequent to *Greenman,* strict liability in tort was applied to landlords for injuries to tenants in *Fakhoury* v. *Magner* (1972) 25 Cal.App.3d 58, 62-63 [101 Cal.Rptr. 473] and *Golden* v. *Conway* (1976) 55 Cal.App.3d 948, 960-963 [128 Cal.Rptr. 69]. In *Fakhoury,* a couch in a furnished apartment collapsed, and the court held that the landlord is strictly liable in tort for defective furniture, pointing out that the liability was not for defective premises. (25 Cal.App.3d at p. 63.) In *Golden,* the landlord employed a contractor to install a heater, and because of defective manufacture or installation there was a fire. Although acknowledging the distinction made in *Fakhoury* between defective fixtures and defective furniture, the court rejected it and held that the landlord engaged in the business of leasing property is strictly liable in tort when he equips the premises with an appliance which proves to have defects causing injury. (55 Cal.App.3d at pp. 960-963.) Defendant points out that *Fakhoury* differs from the instant case because injury resulted from defective personalty rather than the condition of the premises and that *Golden* differs because the landlord installed the heater whereas the shower door was apparently installed by the builder.

■ We are satisfied that the rationale of the foregoing cases, establishing the duties of a landlord and the doctrine of strict liability in tort, requires us to conclude that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant.[4] It is clear that landlords are part of the "overall producing and marketing enterprise" that makes housing accommodations available to renters. (Cf. *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d at p. 262; *Green* v. *Superior Court, supra,* 10 Cal.3d at pp. 623, 627.) A landlord, like defendant owning numerous units, is not engaged in isolated acts within the enterprise but plays a substantial role. The fact that the enterprise is one involving real estate may not immunize the landlord. Our courts have long recognized that contracts relating to realty may give rise to implied warranties. (*Aced* v. *Hobbs-Sesack Plumbing Co., supra,* 55 Cal.2d 573, 580-583.)

■ Absent disclosure of defects, the landlord in renting the premises makes an implied representation that the premises are fit for use as a dwelling and the representation is ordinarily indispensable to the lease. (*Pollard* v. *Saxe & Yolles Dev. Co., supra,* 12 Cal.3d 374, 377-380.) The tenant purchasing housing for a limited period is in no position to inspect for latent defects in the increasingly complex modern apartment buildings or to bear the expense of repair whereas the landlord is in a much better position to inspect for and repair latent defects. (*Green* v. *Superior Court, supra,* 10

---

[4]We do not determine whether strict liability would apply to a disclosed defect. (See *Luque* v. *McLean* (1972) 8 Cal.3d 136, 141-146 [104 Cal.Rptr. 443, 501 P.2d 1163].)

Cal.3d at p. 626.) The tenant's ability to inspect is ordinarily substantially less than that of a purchaser of the property. (Cf. *Pollard* v. *Saxe & Yolles Dev. Co., supra,* 12 Cal.3d at p. 379.)

The tenant renting the dwelling is compelled to rely upon the implied assurance of safety made by the landlord. It is also apparent that the landlord by adjustment of price at the time he acquires the property, by rentals or by insurance is in a better position to bear the costs of injuries due to defects in the premises than the tenants.

In these circumstances, strict liability in tort for latent defects existing at the time of renting must be applied to insure that the landlord who markets the product bears the costs of injuries resulting from the defects "rather than the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63.)

Defendant argues that a landlord who purchases an existing building which is not new should be exempt from strict liability in tort for latent defects because, like dealers in used personalty, he assertedly is not part of the manufacturing and marketing enterprise. Defendant relies on a statement in *Vandemark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262-263: "Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." Defendant states that it has never been in a business relationship with the builder and that purchasers of used rental properties do not have a continuing business relationship with builders permitting adjustments of the costs of protecting tenants.

In several cases, it has been held that a seller of used machinery who does not rebuild or rehabilitate the machinery is not strictly liable in tort. (*Wilkinson* v. *Hicks* (1981) 126 Cal.App.3d 515, 520 et seq. [179 Cal.Rptr. 5]; *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 748 et seq. [176 Cal.Rptr. 224]; *Tauber-Arons Auctioneers Co., Inc.* v. *Superior Court* (1980) 101 Cal.App.3d 268, 273 et seq. [161 Cal.Rptr. 789].) Each of these cases relied at least in part on the theory that the used machinery dealer simply by offering machinery for sale does not make any representation as to quality or durability and thus does not generate the expectation of safety involved in the sale of new goods. (*Wilkinson, supra,* 126 Cal.App.3d at pp. 520-521; *LaRosa, supra,* 122 Cal.App.3d at pp. 760-761; *Tauber-Arons, supra,* 101 Cal.App.3d at p. 278 et seq.) When the seller of the used goods makes extensive modifications or reconditions, he is treated as a manufacturer—there is an expectation that the safety of the product has been

addressed. (*Green* v. *City of Los Angeles* (1974) 40 Cal.App.3d 819, 838 [115 Cal.Rptr. 685].)

*LaRosa* v. *Superior Court, supra,* 122 Cal.App.3d 741, 756-757 and *Tauber-Arons Auctioneers Co., Inc.* v. *Superior Court, supra,* 101 Cal.App.3d 268, 282, also suggested that the used machinery dealer ordinarily is not part of the manufacturing and marketing enterprise.

However, a continuing business relationship is not essential to imposition of strict liability. The unavailability of the manufacturer is not a factor militating against liability of others engaged in the enterprise. The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects. (*Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 33-34 [136 Cal.Rptr. 574, 560 P.2d 3]; *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]; *Rawlings* v. *D.M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 899 et seq. [159 Cal.Rptr. 119].) If anything, the unavailability of the manufacturer is a factor militating in favor of liability of persons engaged in the enterprise who can spread the cost of compensation. (See *Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, 33-34.) Just as the unavailability of the manufacturer does not militate against liability, the absence of a continuing business relationship between builder and landlord is not a factor warranting denial of strict liability of the landlord.

Landlords are an integral part of the enterprise of producing and marketing rental housing. While used machinery is often scrapped or discarded so that resale for use may be the exception rather than the rule, landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise. In addition, landlords have a continuing relationship to the property following the renting in contrast to the used machinery dealer who sells. As we have seen, in renting property the landlord, unlike the used machinery dealer, makes representations of habitability and safety.

The cost of protecting tenants is an appropriate cost of the enterprise. Within our marketplace economy, the cost of purchasing rental housing is obviously based on the anticipated risks and rewards of the purchase, and thus it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance. Further, the landlord after purchase may be able to adjust rents to reflect such costs. The landlord will also often be able to seek equitable indemnity for losses.

We conclude that the absence of a continuing business relationship between builder and landlord does not preclude application of strict liability in tort for latent defects existing at the time of the lease, because landlords are an integral part of the enterprise and they should bear the cost of injuries resulting from such defects rather than the injured persons who are powerless to protect themselves. (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63.)[5]

## NEGLIGENCE

Civil Code section 1714, subdivision (a) establishes the fundamental principle of negligence liability, providing: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary skill in the management of his property or person, . . ."

Rejecting the prior distinctions made by the common law as to invitees, licensees, and trespassers, the landmark case of *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 111 et seq. held that the fundamental rule was applicable to the liability of owners and occupiers of land. ■ The fundamental principle is applicable to the landlord's liability to the tenant, and the landlord owes a tenant a duty of reasonable care in providing and maintaining the rented premises in a safe condition. (*Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194]; *Evans* v. *Thomason* (1977) 72 Cal.App.3d 978, 985 [140 Cal.Rptr. 525]; *Golden* v. *Conway, supra,* 55 Cal.App.3d 948, 955; *Brennan* v. *Cockrell Investments, Inc., supra,* 35 Cal.App.3d 796, 800-801.)

Any departure from the fundamental principle involves the "balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Rowland* v. *Christian, supra,* 69 Cal.2d at pp. 112-113.)

"In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the prem-

---

[5]In view of our conclusion it is unnecessary to determine whether the landlord is strictly liable for defects in the property which develop after the property is leased.

ises in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland,* a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." (*Stoiber* v. *Honeychuck, supra,* 101 Cal.App.3d 903, 924.)

Accordingly, a landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect. (*Golden* v. *Conway, supra,* 55 Cal.App.3d 948, 955; *Brennan* v. *Cockrell Investments, Inc., supra,* 35 Cal.App.3d 796, 800-801.)

■ Defendant urges that in the absence of knowledge of the defective condition or of prior accidents it was not under a duty to inspect for defective shower doors and that imposition of a duty to inspect would conflict with Civil Code section 1954 limiting the landlord's right to enter a rented dwelling unit. So far as appears in the instant case, the dangerous shower doors were installed by the builder at the time of the construction and were in position at the time defendant purchased the building.

A person contemplating purchase of rental property, in the exercise of due care, will examine its condition. Maintenance of rental property in a safe and habitable condition is the primary responsibility of the landlord. (*Green* v. *Superior Court, supra,* 10 Cal.3d 616, 627.) In the exercise of ordinary care, the purchaser of rental property may be expected to inspect the premises not only to determine whether they are aesthetically pleasing but also to determine whether they meet bare living standards, including whether they are safe. The prospective purchaser may be expected to make such inspection in the absence of knowledge of any existing defects or of any prior accidents. Similarly, a landlord at time of letting may be expected to inspect an apartment to determine whether it is safe.

The mere fact that a particular kind of an accident has not happened before does not show that such accident is one which might not reasonably have been anticipated. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40,

47 [123 Cal.Rptr. 468, 539 P.2d 36].) Defective glass doors provide a substantial risk of injury which reasonably may be anticipated.

Civil Code section 1954 limiting the right of the landlord to enter the tenant's premises provides that he may enter to exhibit the dwelling unit "to prospective or actual purchasers" and to make necessary repairs, and the section does not provide a bar to recognition of a duty to inspect in the instant case. Defendant's officials inspected the apartments.

We conclude that a duty to inspect for dangerous conditions in the exercise of due care may properly be found in the instant case and that lack of awareness of the dangerous condition does not necessarily preclude liability.

In urging that there was no duty to inspect, defendant relies upon cases where the defect developed after purchase of the building by the defendant and while the apartment was in possession of the tenant. (E.g., *Uccello* v. *Laudenslayer* (1975) 44 Cal.App.3d 504, 510 et seq. [118 Cal.Rptr. 741, 81 A.L.R.3d 628].) Those cases are distinguishable because, in the instant case, the dangerous condition existed at the time of purchase and at the time the property was leased.

The duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable inspection. In the instant case, the undisputed affidavits are to the effect that there was "no visible difference between the tempered and untempered glass in terms of visible appearance," but that there was a "very small mark" in the corner of each piece of glass which apparently showed that the glass was untempered. The glass was not before the trial court when it granted the motion for summary judgment, and the record does not disclose the nature of the "mark." If the "mark" was "untempered" a trier of fact could properly conclude that a reasonable inspection would have, at least, included a visual inspection which disclosed the danger. In resolving doubts in favor of the party opposing the motion for summary judgment (*Rowland* v. *Christian, supra,* 69 Cal.2d 108, 111), defendant's failure to fully identify the "mark" requires us to assume that it would have disclosed the danger to a reasonable inspection.

As to each cause of action the trial court erred in granting summary judgment in favor of defendant.

The judgment is reversed.

Kaus, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Concurring.—Justice Newsom wrote a fine opinion in the Court of Appeal with which I agree. It is adopted herewith as my own.*

"This is an appeal from a summary judgment dismissing appellant's causes of action for negligence and strict products liability. Declarations submitted by respondent in support of its motion for summary judgment reveal the following pertinent facts, which we summarize as necessary to a resolution of the issues raised on appeal.

Appellant was seriously injured on November 21, 1978, when he slipped and fell against the *untempered* glass shower door of his rented apartment, which is in a 36-unit apartment complex owned, operated and maintained by respondent. The apartment complex was built in 1963 and acquired by IRM Corporation in 1974 [IRM]. According to undisputed evidence, had the shower door been made of *tempered* glass, the risk of serious injury to appellant would have been reduced.

The declarations submitted in support of the summary judgment motion state that between the time respondent acquired the building and appellant's injury none of the tenants either complained that the shower doors were made of unsafe untempered glass or reported injuries similar to those suffered by appellant. Appellant's shower door was in place when IRM purchased the apartment complex. Of the 36 showers in the apartment building prior to appellant's accident, 31 had untempered and 5 had tempered glass.

It is difficult to visually distinguish tempered from untempered glass. The apartment manager for IRM declared that he walked through most of the bathrooms prior to appellant's accident, and found the two types of shower doors to be highly similar: he said both had a "frosted glass" appearance. After the accident, at respondent's request, a maintenance man for IRM and an expert from Diablo Glass & Paint Company inspected the shower doors. According to the maintenance man, "from my own examination following the . . . accident, there was no visible difference between the tempered or the nontempered glass in terms of visible appearance." But he also explained: "The only way that I was able to differentiate . . . was by looking for a very small mark in the corner of each piece of glass." After the inspection, the 31 shower doors without tempered glass were replaced with doors made of tempered glass.

The summary judgment procedure authorized by section 437c of the Code of Civil Procedure is a " ' ' "drastic procedure to be used sparingly and with

---

*Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote my insertions or additions.

circumspection." . . .' " (*Harris* v. *De La Chapelle* (1976) 55 Cal.App.3d 644, 647 [127 Cal.Rptr. 695][, disapproved on another point in *Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 372, fn. 9 (178 Cal.Rptr. 783, 636 P.2d 1121)].) A defendant moving for summary judgment has the burden of establishing that the action is without merit; a factual showing negating all causes of action on all theories is required. (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 666 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]; *Harris, supra,* at p. 647.) "If he fails in that burden, summary judgment must be denied despite the lack of opposing declarations." (*Tresemer, supra,* at p. 666.) But if all material issues of fact are eliminated and the declarations filed in support of the motion establish that the defendant is entitled to judgment as a matter of law, summary judgment should be granted. (*Tauber-Arons Auctioneers Co.* v. *Superior Court* (1980) 101 Cal.App.3d 268, 273-274 [161 Cal.Rptr. 789].) " 'Applicable substantive law determines the facts necessary to support a particular theory of relief and hence the sufficiency of properly framed factual statements in declarations to support a summary judgment.' " (*Tresemer, supra,* at pp. 666-667.)

Appellant claims that his negligence cause of action presents issues of fact which must be litigated at trial. He insists that respondent's declarations do not sufficiently negate the elements of his action for negligence.

Respondent submits that it had no *duty* of care to appellant, absent actual notice of the dangerous condition of the shower doors, and that its declarations disprove such notice.

The essential elements of a cause of action for negligence are: (1) defendant's legal duty of care to plaintiff, (2) defendant's breach of duty—by negligent act or omission, (3) injury to plaintiff as the result of the breach, and (4) compensable damages. (*Rosales* v. *Stewart* (1980) 113 Cal.App.3d 130, 133 [169 Cal.Rptr. 660]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 450, p. 2103.) Liability for negligent conduct may only be imposed where it is found that defendant owed a duty of care to the plaintiff or to a class of persons of which the plaintiff is a member. (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]; *Rogers* v. *Jones* (1976) 56 Cal.App.3d 346, 350 [128 Cal.Rptr. 404].) The duty may arise by statute, contract, the general character of the activity in which the defendant engaged, the relationship of the parties, or even the interdependent nature of human society. (*J'Aire, supra,* at p. 803.) "Whether a duty is owed is simply a shorthand way of phrasing what is ' "the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' " (*Ibid.*)

The crucial issue before us is, therefore, whether plaintiff has established that his corporate landlord owed a duty of care to protect him against the

particular risk of harm which caused his injury. ([See] *Evans* v. *Thomason* (1977) 72 Cal.App.3d 978, 984 [140 Cal.Rptr. 525].) " 'While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as a result of their conduct. . . .' " (*J'Aire, supra,* 24 Cal.3d at p. 806; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) In *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], our high court enumerated the following factors as relevant to a determination of whether a possessor or owner of land owes a duty of care to injured victims: the foreseeability of the harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; the policy of preventing future harm; the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and the availability, cost and prevalence of insurance for the risk involved. (See also *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Sun N' Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 695 [148 Cal.Rptr. 329, 382 P.2d 920]; *Rosales* v. *Stewart, supra,* 113 Cal.App.3d 130, 134; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694, 702 [133 Cal.Rptr. 920].)

But in all cases, the primary consideration in establishing the element of duty is the foreseeability of the risk. (*Sun N' Sand, supra,* 21 Cal.3d at p. 695; *Weirum, supra,* 15 Cal.3d at p. 46; *DeSuza, supra,* at p. 702.) " 'As a general principle, a "defendant owes a duty of care to all persons who are *foreseeably* endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." ' " (*Tresemer* v. *Barke, supra,* 86 Cal.App.3d 656, 670.) The question of whether a legal duty exists is one of law (*Thompson* v. *County of Alameda[, supra,]* 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]), but if the issue depends upon the foreseeability of the risk it becomes a question of fact for resolution by the jury (*Weirum* [], *supra,* 15 Cal.3d 40, 46; *Harris* v. *De La Chapelle, supra,* 55 Cal.App.3d 644, 647).[1]

It is now settled that a landlord generally owes a tenant a duty of reasonable care in maintaining the rented premises in a safe condition. (*Evans* v. *Thomason, supra,* 72 Cal.App.3d 978, 985; *Golden* v. *Conway* (1976) 55

---

[1]The reasonableness of the defendant's conduct is also a question for the trier of fact. (*Slater* v. *Alpha Beta Acme Markets, Inc.* (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264].)

Cal.App.3d 948, 955 [128 Cal.Rptr. 69]; *Brennan* v. *Cockrell Investments, Inc.* (1973) 35 Cal.App.3d 796, 800-801 [111 Cal.Rptr. 122].) In *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 924 [162 Cal.Rptr. 194], the court explained: "In the typical rental situation involving a dwelling house, the foreseeability of harm to a tenant from the landlord's failure to maintain the premises in a habitable condition is obvious; the degree of certainty that the tenant suffered injury and the closeness of the connection between the landlord's conduct and the injury is readily ascertainable by proof in each case; the moral blame attached to the landlord's conduct in not complying with the habitability requirements articulated in the Civil Code and the policy of preventing future harm are present. Nor can we say that the imposition of a duty to exercise care with resulting liability for breach would unduly extend a landlord's burden insofar as the availability, cost and prevalence of insurance for the risk involved. In short, we believe that under the policy standards articulated in *Rowland,* a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises."

And in *Golden* v. *Conway, supra,* 55 Cal.App.3d at page 955, this court adopted the standard expressed in *Brennan* v. *Cockrell Investments, Inc., supra,* 35 Cal.App.3d 796, that ". . . a landlord must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of such injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect . . . ."

But like any other business proprietor or owner of property, the landlord is not an insurer of a tenant's safety. (*Riley* v. *Marcus* (1981) 125 Cal.App.3d 103, 109 [177 Cal.Rptr. 827]; *Rogers* v. *Jones, supra,* 56 Cal.App.3d 346, 351.) And, we repeat, as in all cases, foreseeability is the key factor to be considered. (*Coulter* v. *Superior Court* (1978) 21 Cal.3d 144, 152 [145 Cal.Rptr. 534, 577 P.2d 669][, superseded by statute as stated in *Strang* v. *Cabrol* (1984) 37 Cal.3d 720, 724 (209 Cal.Rptr. 347, 691 P.2d 1013)]; *Riley, supra,* at p. 109.) Consequently, we must decide whether the unsafe nature of the shower doors was reasonably foreseeable by respondent.

The uncontradicted evidence offered by respondent establishes that IRM had no actual notice of the dangerous condition of the premises either from complaints or previous accidents. According to undisputed declarations, it was also difficult to distinguish the untempered glass shower doors from those made of tempered glass; only a "very small mark in the corner of each piece of glass," observed upon a careful inspection following appellant's accident, set the two types of doors apart.

But foreseeability does not require that prior identical or even similar events must have occurred. (*Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324, 329 [176 Cal.Rptr. 494].) As noted in *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 47: " 'The mere fact that a particular kind of [an] accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.' " Appellant's accident cannot be characterized as unforeseeable simply because it was the first of its kind at the apartment complex.

And although the dangerous condition of the shower door may not have been readily apparent, the evidence indicates that it was discoverable upon reasonably careful inspection. In light of the landlord's control over the premises and ability to insure against the risk of injury, we think it reasonable to conclude that foreseeability of risk presented a triable issue of fact best left for resolution by the jury. That IRM had no actual notice of the risk should not, we repeat, absolve it from a duty of care as a matter of *law.* Maintenance of rental property, particularly fixtures and appliances, in a safe and habitable condition, has been recognized as an important obligation of the landlord. (*Green* v. *Superior Court* (1974) 10 Cal.3d 616, 626-627 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Stoiber* v. *Honeychuck, supra,* 101 Cal.App.3d 903, 914, 924.)[2] Since it was possible if not likely that IRM would have learned of the dangerous condition of the property had it devoted closer attention to the safety of its tenants, particularly given the direct and serious threat of harm which the hazard posed to IRM's tenants, we think that the trial court erred in granting summary judgment and dismissing appellant's negligence action.

Appellant also argues that respondent's declarations do not negate his strict liability cause of action since the doctrine of strict products liability applies to respondent as a supplier of housing. Respondent submits that, on the contrary, as a matter of law a landlord does not incur liability under a theory of strict liability for the defective condition of rented premises.

In the landmark case of *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], our high court announced the rule that, "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to

---

[2]In *Stoiber, supra,* 101 Cal.App.3d 903, the court noted that "public policy requires landlords to bear the primary responsibility for maintaining safe, clean and habitable housing" (*id.,* at p. 914), and added: ". . . we believe that under the policy standards articulated in *Rowland* [v. *Christian* (1968) 69 Cal.2d 108 (70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496)], a due regard for human safety and health compels the imposition on a landlord of a duty of due care in the maintenance of the premises." (*Id.,* at p. 924.)

a human being." (See also *McGee* v. *Cessna Aircraft Co.* (1978) 82 Cal.App.3d 1005, 1012 [147 Cal.Rptr. 694].) "That rule is equally applicable to the manufacturer and the retailer." (*Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 564 [150 Cal.Rptr. 339].)[3]

The courts have freely applied strict liability in tort law link by link in the marketing chain—"from manufacturer to distributor, to retailer, and so forth." (*Kasel* v. *Remington Arms Co.* [, *supra,*] 24 Cal.App.3d 711, 724 [].) California follows a "stream-of-commerce" approach to strict liability, under which " '. . . no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability.' " (*Tauber-Arons Auctioneers Co.* v. *Superior Court, supra,* 101 Cal.App.3d 268, 275-276, quoting from *Kasel* v. *Remington Arms Co., supra,* 24 Cal.App.3d 711, 725.) The strict products liability doctrine extends to all those who are "engaged in the business of distributing goods to the public" as an "integral part of the overall producing and marketing enterprise" for the product in question. (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]; *Tauber-Arons, supra,* at pp. 274-275.) Thus, participation in the marketing enterprise by which distribution of the product to the consuming public is effected in more than a " 'random and accidental role' " justifies imposition of strict liability. (*Tauber-Arons, supra,* at p. 277; *Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319, 326 [82 Cal.Rptr. 420].)[4]

---

[3]In fact, as noted in *Kasel* v. *Remington Arms Co.* [1972] 24 Cal.App.3d 711, 724 [101 Cal.Rptr. 314]: "The following entities besides the manufacturer, obviously the principal one, have been found to be integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor (*McClaflin* v. *Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446 . . . [stepladder] and *Price* v. *Shell Oil Co.,* 2 Cal.3d 245 . . . [gasoline truck]); a developer (*Kriegler* v. *Eichler Homes, Inc.,* 269 Cal.App.2d 224 . . . [a builder engaged in mass tract development of homes]); a licensee (*Garcia* v. *Halsett,* 3 Cal.App.3d 319 . . . [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256 [retailer of a defective automobile]); and a wholesale-retail distributor (*Barth* v. *B.F. Goodrich Tire Co.,* 265 Cal.App.2d 228 . . . [who merely distributed tires from his stock on order of the manufacturer])."

[4]In *Garcia* a launderette owner who maintained four rows of coin-operated washing machines manufactured by Philco-Bendix in continuous operation for public use, was held liable as a marketer. The court observed: "Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, he does provide the product to the public for use by the public, and consequently does play more

Landlords have been included within the scope of the strict products liability doctrine. For example, in *Fakhoury* v. *Magner* (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473], the lessee of a furnished apartment—injured when the couch supplied by her landlord collapsed under her—sued on a theory of strict liability. The court concluded that the landlord was strictly liable as lessor of the defective furniture rather than as lessor of furnished real property. (*Id.*, at p. 63.)

Subsequently, in *Golden* v. *Conway, supra,* 55 Cal.App.3d 948, this court extended the doctrine of strict products liability to a landlord who supplied and installed, through an independent contractor, a defective wall heater in an unfurnished apartment. Relying upon *Fakhoury*, we found no reason to distinguish between furniture and appliances attached to realty, and concluded that a "lessor of real property who, as the landlord in this case, is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it is manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (*Id.*, at pp. 961-962.)

Here, respondent is in the business of leasing apartments, including appliances and fixtures, and is therefore an integral part of the marketing enterprise by which the shower door in question reached the user public. In *Green* v. *Superior Court, supra,* 10 Cal.3d 616, 627, our high court observed: "In most significant respects, the modern urban tenant is in the same position as any other normal consumer of goods. [Citation.] Through a residential lease, a tenant seeks to purchase 'housing' from his landlord for a specified period of time. The landlord 'sells' housing, enjoying a much greater opportunity, incentive and capacity than a tenant to inspect and maintain the condition of his apartment building. A tenant may reasonably expect that the product he is purchasing is fit for the purpose for which it is obtained, that is, a living unit. Moreover, since a lease contract specifies a designated period of time during which the tenant has a right to inhabit the premises, the tenant may legitimately expect that the premises will be fit for such habitation for the duration of the term of the lease. It is just such reasonable expectations of consumers which the modern 'implied warranty' decisions endow with formal, legal protection." The landlord is a vital link in the commercial chain, and directly profits from the consumer's use of products provided as part of the rental unit. We think it a reasonable rule that a landlord should be treated as a "retailer" of rental housing, subject to liability for defects in the premises rented.

---

than a random and accidental role in the overall marketing enterprise of the product in question." (3 Cal.App.3d at p. 326.)

In reaching this conclusion, we have considered that the salutary policies underlying the strict products liability doctrine will be furthered by inclusion of landlords within its scope. According to our high court, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]; see also *Tauber-Arons Auctioneers Co.* v. *Superior Court, supra,* 101 Cal.App.3d 268, 283.) "Placing the economic burden of injuries on those best able to pay for those costs while permitting the transfer of that burden to those most culpable is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed." (*Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 901 [159 Cal.Rptr. 119].) The landlord receives the financial benefit from the tenants' use of appliances included in rental housing, and has the ability to spread the cost of compensation throughout the marketing system by obtaining insurance or otherwise accounting for the risk of loss. In addition, the landlord has control over the rental premises, which provides the means by which the possible harm from defective appliances or fixtures can be eliminated.

We find the cases relied upon by respondent unpersuasive. In both *Tauber-Arons Auctioneers Co.* v. *Superior Court, supra,* 101 Cal.App.3d 268, and *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, [176 Cal.Rptr. 224] it was held that a dealer in used products acting merely as an agent for the seller or manufacturer, and who has no other connection with the product, cannot be held strictly liable in tort for its defective condition. In contrast, here respondent played no such random and accidental role in the marketing of the untempered glass shower doors; rather, it directly provided the product to tenants for their use, thus actively entering the marketing enterprise for that product.

It is vigorously argued as a reason for exclusion of respondent from liability as a matter of law, that it was not the owner of the building when the allegedly defective product was installed. Once IRM became the landlord, however, it acted in effect as distributor or supplier of housing, with authority and ability to monitor all products so furnished, including appliances and fixtures in the apartments. And by failing to remove shower doors made of untempered glass, respondent maintained the distribution of these appliances to its tenants.

Respondent argues with equal force that it reasonably ought not to incur liability for the defective shower doors because it had no notice of the defect. We disagree, since we regard notice as irrelevant to the strict liability analysis.

The doctrine of strict products liability is based upon a defect in the product, and can arise from an unsafe design as well as from faults attributable to the manufacturing process. (*Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229].)

While the operative term "defect" is not capable of precise definition, and is concededly an amorphous and elusive concept, it does *not* require proof that the defective design renders the product "unreasonably dangerous" to the unsuspecting customer. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]; *McGee* v. *Cessna Aircraft Co., supra,* 82 Cal.App.3d 1005, 1015; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 544 [132 Cal.Rptr. 605].) On the other hand, of course, neither does the concept of strict liability make the manufacturer an absolute insurer of its product. (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].)

Our high court has suggested that issue of defectiveness can best be resolved by resort to the "cluster of precedents" forming the crucible in which the products liability doctrine has been forged and shaped. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]; *Cronin* v. *J.B.E. Olson Corp., supra,* at p. 134.) In *Barker, supra,* the court enumerated the following as standards to be employed in determining whether a product is defectively designed: "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.,* at p. 432.)

In evaluating the adequacy of a product's design pursuant to these standards, a jury may consider, among other relevant factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer alternative design; the financial cost of an improved design; and the adverse consequences to the product and the consumer that would result from an alternative design. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 431; *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398]; *Southern Cal. Edison Co.* v. *Harnischfeger Corp.* (1981) 120 Cal.App.3d 842, 854 [175 Cal.Rptr. 67].) The cases have recognized the "need to 'weigh' competing considerations in an *overall* product design, in

order to determine whether the design was 'defective.'" (*Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, 746, italics added.)

The strict liability doctrine also "'requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse. . . .'" (*Buccery* v. *General Motors Corp., supra,* 60 Cal.App.3d 533, 546; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 7 [116 Cal.Rptr. 575].) Strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. (*Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, 126; *Self, supra,* at p. 7.) But as the court acknowledged in *Cronin, supra:* "The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." (*Id.,* at p. 126; *Buccery, supra,* at p. 546; *Self, supra,* at p. 7.) The prospect of liability for injuries resulting from foreseeable abuse and misuse "keeps the manufacturer on his toes and thereby serves a socially useful purpose." (*Self* v. *General Motors, supra,* 42 Cal.App.3d at p. 8.) []"

**LUCAS, J.,** Concurring and Dissenting.—I concur in that portion of the majority opinion which holds that a landlord may be held liable for dangerous conditions of which he knew or should have known. However, I cannot join in imposing upon landlords strict liability for latent defects in any component of their property no matter who built or installed the defective item.

Taking an unprecedented leap, the majority imposes "an unusual and unjust burden on property owners . . . [T]he landlord [will] be faced with liability for every injury claim resulting from any untoward condition in every cranny of the building, whether it is reasonably foreseeable or not." (*Dwyer* v. *Skyline Apartments, Inc.* (1973) 123 N.J.Super. 48 [301 A.2d 463, 467], affd. obiter dictum, 63 N.J. 577 [311 A.2d 1].) Any landlord, even one renting the family home for a year, will now be insurer for defects in any wire, screw, latch, cabinet door, pipe or other article on and in his premises at the time they are let despite the fact that he neither installed the item nor had any knowledge or reason to know of the defect. I believe, in conformance with the almost unanimous judgment of other jurisdictions considering this issue, that such imposition of liability is inappropriate. As one authority has remarked, "One problem in analyzing product liability law is our tendency to study rule changes in isolation and not to analyze their aggregate effect on liability costs or primary behavior." (Epstein, *Commentary* (1983) 58 N.Y.U. L.Rev. 930, 931.) My colleagues here have taken just such an "isolated" viewpoint.

Justice Traynor, over 40 years ago in his classic concurrence, reasoned that "it should now be recognized that a manufacturer incurs an absolute liability when an article that he has placed on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to human beings." (*Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436].) Thereafter, in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], speaking for a unanimous court, Justice Traynor explained that "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." In other words, one who *makes* the product should be held responsible for its defects.

The next year, strict liability was extended to retailers. (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].) The rationale articulated in support of this extension was that "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. . . . Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and *works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship.*" (*Id.* at pp. 262-263, italics added.) We later held that lessors and bailors of personal property similarly might be held strictly liable, after stressing "the necessity for a continuous course of business as a condition to application of the rule . . . ." (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 253-254 [85 Cal.Rptr. 178, 466 P.2d 722].) As I shall discuss, this requirement of a continuing relationship which avoids "injustice" to defendants is given no meaningful consideration in the majority approach.

The potential liability of *producers* of residences was addressed in *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749], a case cited with approval in *Price, supra,* (2 Cal.3d at p. 251, fn. 6), for the proposition that manufacturers placing products on the market, including mass producers of homes, should be held strictly liable for defects in their products. The *Kriegler* court concluded that "there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (269 Cal.App.2d at p. 227; see *Del Mar Beach Club Owners Assn.* v. *Imperial Contracting Co.* (1981) 123 Cal.App.3d 898, 911-912 [176 Cal.Rptr. 886, 25 A.L.R.4th 336].) *Kriegler*'s holding rested on the identification of Eichler as essentially a "man-

ufacturer of homes," a situation undeniably very different from the one present here. IRM Corporation *purchased* an already "produced" and used property.

This distinction between a party actually selecting, installing, constructing and buying the defective product and a party who plays no such role and *therefore has no connection with anyone up the ladder of distribution,* was fundamentally adhered to by the Court of Appeal in two cases dealing with defects allegedly present in items found on or in leased premises. In *Fakhoury* v. *Magner* (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473], the plaintiff was injured when a couch in a rented apartment collapsed. She sued her landlord in strict liability asserting latent defects in the furniture. The court concluded that the landlord could be held strictly liable "not as lessor of real property, but as lessor of the furniture." (P. 63.) The requirement that property be placed in the stream of commerce was met because "a casual or isolated transaction will not bring the doctrine into play. [However, in] the case at hand, the landlord furnished two apartments in San Francisco and three in Sacramento at the same time with the same kind of couch purchased from the same seller." (P. 64.) In the instant case, the shower door was a fixture and the defendant is being sued as lessor of property not as lessor of furniture. Moreover, the shower doors had not been purchased by defendant.

The role of strict liability in landlord-tenant relationships was further explored in *Golden* v. *Conway* (1976) 55 Cal.App.3d 948 [128 Cal.Rptr. 69]. The plaintiff sued the landlord in strict liability after suffering damages in a fire caused by a wall heater installed by a contractor at the landlord's behest approximately one year before. The court permitted maintenance of the cause of action on the ground "that a lessor of real property who . . . is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (Pp. 961-962.) The installation of the heater assertedly created the dangerous condition, and the court was careful to distinguish the facts from those in *Ruiz* v. *Minnesota Mining & Mfg. Co.* (1971) 15 Cal.App.3d 462 [93 Cal.Rptr. 270]. In the latter case, the *Golden* court stressed, a product used on the premises was defective "and the property owner merely failed to take corrective action because he did not discover the defect" and therefore was not strictly liable. (55 Cal.App.3d at p. 963.) In our case, there is no allegation that the landlord was aware of the defect in the already present product.[1]

---

[1] The *Golden* court did *not* discuss whether the transaction at issue there was an isolated

The treatment of cases involving used goods and their sale better highlights relevant concerns ignored by the majority. In *Tauber-Arons Auctioneers Co.* v. *Superior Court* (1980) 101 Cal.App.3d 268 [161 Cal.Rptr. 789], the Court of Appeal held that an auctioneer of used machinery who did not perform any maintenance or repair on the equipment, did not inspect it, and sold it "as is," could not be held strictly liable for any defects in the items. The court stated that when considering the requirement that a potential defendant be a participant "in the manufacturing-marketing system" before he be held subject to strict liability, one significant factor is "the requirement that defendant have a participatory connection with the enterprise which 'created consumer demand for and reliance upon' the particular 'injury-producing product' [citation] not just products of the same classification." (101 Cal.App.3d at p. 276; see also *Brejcha* v. *Wilson Machinery, Inc.* (1984) 160 Cal.App.3d 630, 639 [206 Cal.Rptr. 688].) The court further emphasized participation in the "initial distribution of the particular manufacturer's products . . . ." (P. 277.) Because a used machinery dealer normally "has no continuing business relationship with the manufacturer in the course of which he can adjust the cost of protection from strict liability . . . the rationale which underlies *Vandermark* simply is inapplicable to such a dealer. Moreover, the risk reduction which was sought in *Vandermark* on the assumption that 'the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end' (61 Cal.2d at p. 262) . . . is simply unattainable because the 'used-goods dealer is normally entirely outside the original chain of distribution of the product . . . .' (*Tillman v. Vance Equipment Co.* [(Ore. 1979) 596 P.2d 1299, 1304].)" (101 Cal.App.3d at p. 283, fn. omitted; see also *Wilkinson* v. *Hicks* (1981) 126 Cal.App.3d 515, 521 [179 Cal.Rptr. 5]; *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 753-754 [176 Cal.Rptr. 224].) Analogous considerations apply in the case of the "used property" lessor.

Discounting other crucial and long-recognized justifications for imposition of strict liability, my colleagues focus primarily on the "risk-spreading" function of this form of liability. Essentially they ignore the fact that landlords of used property have no special position with regard to original manufacturers and sellers and thus have no influence to wield in order to improve product safety. Moreover, contrary to the majority's implication, the landlord, while impliedly representing that the premises are habitable,

one and therefore not normally the subject of an action in strict liability. The relevant continuing relationship usually is the one between the party sought to be held strictly liable and those up the chain of distribution to the manufacturer. Neither the relationship of the landlord to the marketing chain, nor between landlord and tenant was considered for this purpose, and I therefore consider *Golden* to be of limited assistance in evaluating the underlying policy problems.

is not representing to tenants that he has expertise and guarantees the perfection of every item forming the premises. Instead of considering what role landlords of used property realistically play with regard to that property, the majority concentrates narrowly on the advancement of "The paramount policy of the strict products liability rule [namely] the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects." (*Ante,* p. 466.) Next my colleagues observe that "landlords are essential to the rental business. They have more than a random or accidental role in the marketing enterprise [and] a continuing relationship to the property following the renting . . . ." In addition, "it may be expected that along with numerous other factors the price of used rental housing will depend in part on the quality of the building and reflect the anticipated costs of protecting tenants, including repairs, replacement of defects and insurance," and that rentals may be adjusted to cover such costs. (*Ante,* at p. 466.)[2]

One major difficulty with this approach is the concentration on the wrong "stream of commerce." Unquestionably a landlord has more than an "accidental role" in the marketing of rental property. Except for those who on a one-time basis rent out a piece of property for a reasonably short term, every landlord of both multiple and single properties has a continuing role in the rental market. But those same landlords in all likelihood will have absolutely no direct or continuing relationships with the *manufacturers and marketers* of the particular defective products found on the premises. We are not discussing here those who *build* the property; we are discussing those who purchase already existing multiple residence properties. In fact, applying the majority's analysis, those who decide to rent out the family home on a regular basis are also now strictly liable for defects in any item located therein. Under the majority's formulation, where the relevant relationship is that of landlord to his property and tenants, any landlord is now strictly liable for defects of which he or she has no knowledge or reason to

---

[2]One Court of Appeal recently undertook an extensive review of strict liability in the context of sellers of used machinery which "they neither inspected, repaired nor modified." (*LaRosa* v. *Superior Court, supra,* 122 Cal.App.3d 741, 743.) It reviewed five "policy predicates" for strict liability described in Note, *Sales of Defective Used Products: Should Strict Liability Apply?* (1979) 52 So.Cal.L.Rev. 805, namely, (1) enterprise liability (forcing the enterprise to bear costs of injuries caused by its defective products); (2) deterrence; (3) risk distribution; (4) practicality (problems of proof made easier by application of strict liability) and (5) implied representations of safety because product is present on the market. (122 Cal.App.3d at pp. 756-760.) The Court of Appeal found that as to the risk-distribution rationale, so heavily relied upon here by the majority, "the very pervasiveness of the . . . rationale suggests that it is probably insufficient, by itself, to justify *strict* liability." (122 Cal.App.3d at p. 759.) As to diminishing problems of proof, the court observed "ease of recovery is not really a *rationale* for strict liability; more precisely it describes the *effect* strict liability was expected to have. Obviously if ease of recovery *were* a pervasive rationale for strict liability then strict liability would be the universal rule." (*Id.* at p. 760.) These conclusions have validity in our context as well.

know and which appear in any part of the property no matter how esoteric the understanding necessary to comprehend the working of that part.[3] Nothing in the majority's approach is necessarily confined to landlords of multiple residences.

The weakness of the majority's analysis of the relevant stream of commerce is revealed by consideration of its basis for concluding that "a continuing business relationship is not essential to imposition of strict liability." It relies upon *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3], for the proposition that unavailability of a manufacturer militates in favor of the imposition of liability on "persons engaged in the enterprise who can spread the cost of compensation." (See *ante,* p. 466.) In *Alad,* we held that a corporation which had acquired all assets of the manufacturer of the defective product and which continued to run the business in a manner almost identical to its original form, could be held strictly liable for defects in a product manufactured by the predecessor corporation. "By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products' (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262)." (*Ray* v. *Alad Corp., supra,* 19 Cal.3d at p. 34.) Under those narrow circumstances, we held the successor could be held liable.

Similar complete unavailability of the manufacturer or others in the original chain of distribution simply is not at issue here. As the majority states in its recitation of facts, the plaintiff here settled with the builder and a door assembler and installer for a minimum of $150,000 and has actions pending against defendants in addition to the landlord. No legal unavailability of the kind occurring in *Alad* presented a problem for plaintiff's recovery. Moreover, there is no reasonable suggestion that the relationship between the landlord here and any party participating in the original manufacture and distribution of the shower door can be analogized to the almost complete overlap of the corporate entities in *Alad.* It is illogical to conclude that the landlord here became part of the overall *marketing* scheme for the shower doors merely by purchasing property in which they had long since been installed.

[3]This sharply contrasts with the general view that "Only a seller who can be regarded as a merchant or as one engaged in the business of supplying goods of the kind involved in the case is subject to strict liability . . . ." (Prosser & Keeton on the Law of Torts (5th ed. 1984) Products Liability, § 100 at p. 705.) We conformed to this viewpoint in *Price* where the court concluded "that for the doctrine of strict liability in tort to apply to a lessor of personalty, the lessor should be found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." (2 Cal.3d at p. 254.) The majority makes landlords "merchants" of anything contained in or on their property, no matter what the expertise or familiarity entailed, or the actual role of the landlord with regard to the particular product at issue.

Unlike retailers, lessors, bailors, wholesalers or others in the original chain of distribution of the product, the landlord owning used property cannot adjust the costs of protection up the chain. He may only do it, at best, *down* the chain of "distribution," namely by charging more to his tenants. Unlike the others mentioned above, such a "merchant" has no opportunity to enter into indemnification agreements with those more closely linked with the making of the product—he will have little idea if any when he buys the property as to the origin of items such as the wiring found in the walls, and without doubt even if he has such knowledge will have no bargaining power to enter into any agreements with such suppliers. Moreover, his responsibility extends to a myriad of products, unlike the situation faced by a retailer of a particular line of goods. Landlords henceforth are in a risky business. No matter how carefully they inspect, and no matter how impossible to discern the defect, they are now the last outpost of liability for countless unrelated products in which they have no particular expertise.[4]

Consideration of the inherent problems—and unfairness—in extending strict liability to landlords has led almost every other jurisdiction deciding this issue to decide that imposition of such liability is unwarranted. In 1973, a New Jersey appellate court so held in a decision affirmed by that state's highest court. The opinion contained a cogent discussion of some of the reasons why use of this theory of recovery is inappropriate in this context:

"The underlying reasons for the enforcement of strict liability against the manufacturer, seller or lessor of products or the mass builder-vendor of homes do not apply to the ordinary landlord of a multiple family dwelling.

"Such a landlord is not engaged in mass production whereby he places his product—the apartment—in a stream of commerce exposing it to a large number of consumers. He has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition so as to be saddled with responsibility for a defect regardless of negligence.

---

[4]One court summed up the difference between extending strict liability to lessors of commercial products and to motel owners in a manner which has general application in our context as well: "A major consideration in holding lessors of commercial products strictly liable was that such lessors possessed expert knowledge of the characteristics of the equipment or machines they leased. [Citations.] Another consideration is that such lessors, like retailers, deal continually with their suppliers, giving them an enduring relationship which permits them to seek contribution and indemnification. These considerations do not apply when a motel operator makes a one-time purchase of furnishings and fixtures about which he has no special expertise. Therefore, we hold that a motel operator is not strictly liable for defects in the fixtures and furnishings of the rooms he held out to the public." (*Livingston* v. *Begay* (1982) 98 N.M. 712 [652 P.2d 734, 738-739].)

"An apartment involves several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes. It is a commodity wholly unlike a product which is expected to leave the manufacturer's hands in a safe condition with an implied representation upon which the consumer justifiably relies.

"The tenant may expect that at the time of the letting there are no hidden dangerous defects known to the landlord and of which the tenant has not been warned. But he does not expect that all will be perfect in his apartment for all the years of his occupancy with the result that his landlord will be strictly liable for all consequences of any deficiency regardless of fault. He expects only that in the event anything goes wrong with the accommodations or the equipment therein, the landlord will repair it when he knows or should know of its existence; and that if injury results liability will attach." (*Dwyer* v. *Skyline Apartments, Inc., supra,* 301 A.2d at p. 467.)

Several other courts have reached similar conclusions in reviewing analogous cases. As the Missouri Court of Appeals observed, "No case has been cited, nor has one been found, imposing strict liability upon the non-builder landlord for latent defects, rendering the premises unsafe or dangerous, absent some actual or constructive notice of the defects." (*Henderson* v. *W. C. Haas Rlty. Management, Inc.* (Mo.App. 1977) 561 S.W.2d 382, 387.)[5] Cases rejecting application of liability without knowledge have utilized various approaches. (See, e.g., *Meyer* v. *Parkin* (Minn.App. 1984) 350 N.W.2d 435, 438-439 [recent legislation did not eliminate requirement of scienter on part of landlord before he has duty to warn lessee of concealed defects]; *George Washington University* v. *Weintraub* (D.C.App. 1983) 458 A.2d 43, 49 and fn. 9 [landlord exercising reasonable care may not be held liable for losses caused from defects of which he neither knew nor should have known]; *Livingston* v. *Begay, supra,* 652 P.2d 734 [lessor of motel room not strictly liable; theory not meant to apply to "unsafe design of a hotel room"]; *Boudreau* v. *General Elec. Co.* (1981) 2 Hawaii App. 10 [625 P.2d 384, 389-390, 34 A.L.R.4th 86] [strict liability requires lessor be engaged in business of supplying goods in which defect is claimed]; *Segal* v. *Justice Court Mut. Housing Co-op* (1980) 105 Misc.2d 453 [432 N.Y.S.2d 463, 467], affd. (1981) 108 Misc.2d 1074 [442 N.Y.S.2d 686] [no strict liability of landlords under public policy or legislation; they are not insurers of property]; *Kidd* v. *Price* (Ky.App. 1971) 461 S.W.2d 565, 567 [liability for latent defect depends on notice or knowledge thereof].)

---

[5]The one apparent exception is in Louisiana where *pursuant to statute* a landlord may be held liable for defects in the absence of actual knowledge of the defective condition of his property. (See *Parr* v. *Head* (La.App. 1983) 442 So.2d 1234, 1235; *Buxton* v. *Allstate Ins. Co.* (La.App. 1983) 434 So.2d 605, 607-608.)

I would hold that a subsequent purchaser of property who has not installed, altered or created the item or condition which is claimed to be defective, and who has no actual or constructive knowledge of any defect therein, should not be held strictly liable. If the landlord knows or should know of the defect, then he has a duty to take appropriate action to correct or warn of the problem. However, where the landlord has no continuing relationship with the chain of marketing leading back to the manufacturer of the defective product, and thus has no way of influencing the production or design of the product or of adjusting potential costs of the *manufacturer's* enterprise or others in the business of marketing the item at issue, imposition of strict liability is inappropriate. The only rationales supporting such responsibility are ease of proof for the injured party and "distributing" the risk of damages to the landlord. The costs of such an extension of liability to those *without* expertise or continuing relationships for the multiple products and parts for which they may now bear responsibility will entail a significant shift in how our tort system has heretofore operated. It amounts, in effect, to insurance for tenants,[6] because it does nothing to aid in the goals of deterrence or product safety.

I would affirm the trial court's decision to the extent that it granted summary judgment to defendant on the cause of action sounding in strict liability, while joining in the majority's reversal as to the negligence cause of action.

Mosk, J., concurred.

---

[6]The majority never considers the economic effect of its holding. The only logical result is that the price of rental housing will increase because of the increased cost of insurance, assuming insurance can be obtained for this purpose. Even if landlords can sue participants in the original line of manufacture and marketing, the litigation costs involved will likely also have an effect on the price of rental housing. Arguably, instead of risk distribution, the majority's conclusion will result in a general increased cost attributable to the risks involved without a concurrent benefit. Someone will have to pay for the additional litigation today's decision is likely to create.