[No. B0019269. Second Dist., Div. One. Apr. 9, 1987.]

DAN LUNDELL, Plaintiff and Appellant, v.
SIDNEY MACHINE TOOL COMPANY et al., Defendants and
Respondents.

**COUNSEL**

Lawrence R. Booth and John J. Barton for Plaintiff and Appellant.

Buck, Molony & Ammirato and James M. Cox for Defendants and Respondents.

**OPINION**

**HANSON (Thaxton), J.—**

### INTRODUCTION

This product liability case arises out of an accident occurring on November 18, 1981, when plaintiff Dan Lundell (plaintiff and/or Lundell), while in the course of his employment, received injuries to his hand while operating a lathe.

### PROCEDURAL HISTORY

*On November 3, 1982,* Lundell filed a complaint containing three causes of action (strict liability, negligence, breach of warranty) seeking damages for his injuries. The complaint names as defendant Sidney Machine Tool Company, a corporation.

*On February 18, 1983,* the amended answer to the complaint was filed by "John H. Sherbondy and Mary M. Sherbondy dba Sidney Machine Tool Company (erroneously sued and served on Sidney Machine Tool Company)" —(hereinafter defendants and/or the Sherbondys).

*On August 15, 1985,* following discovery, the Sherbondys filed a motion for summary judgment pursuant to Code of Civil Procedure section 437c along with a memorandum of points and authorities accompanied by a declaration of John H. Sherbondy and accompanied by a separate statement of undisputed material facts as required by section 437c, subdivision (b). Defendants' motion argued that they are not liable as successor of the original Sidney Machine Tool Company. Rather, their proprietorship is a separate entity that has no responsibility for plaintiff's injury.

*On September 16, 1985,* plaintiff Lundell filed a memorandum of points and authorities in opposition to defendants' motion for summary judgment, a declaration of plaintiff's counsel, and plaintiff's statement of disputed issues and facts.

*On December 11, 1985,* the court (Hon. Abraham Gorenfeld, judge pro tem. presiding) granted defendants' motion for summary judgment. Plaintiff appeals. We affirm.

UNDISPUTED FACTS

The following undisputed facts are gleaned from the moving and opposition papers and the record on appeal:

The lathe involved in this litigation was originally manufactured by Sidney Machine Tool Company in 1956. The original company no longer exists, having been purchased in 1961 by the Buhr Machine Tool Company (Buhr-Sidney), and then in 1963 by Summerfeld Machine Company (Summerfeld-Sidney). Summerfeld-Sidney stopped manufacturing lathes in early 1964. The product line was discontinued and no lathe bearing the Sidney name has since been manufactured. In 1967, McFadden Machine Company (McFadden-Sidney) purchased Sommerfeld-Sidney. In April 1974, 10 years after the original company ceased manufacturing lathes, the Sherbondys acquired some of the McFadden-Sidney assets from Paul and Goldie McFadden for $90,000. The assets purchased consisted of various drawings, specifications, parts and patterns necessary to produce parts for the old Sidney lathes. Excluded from the sale were machine tools, production equipment, and raw materials.

The business name "Sidney Machine Tool Company" was carried on as a proprietorship by the Sherbondys, who have operated the business solely

as a proprietorship since then. The business has a single employee, John Sherbondy. The Sherbondys only sell replacement parts to owners of lathes that were manufactured by the original entity known as Sidney Machine Tool Company. Defendants have manufactured neither lathes nor any of the replacement parts they sell. Although the Sherbondys own the designs that make up the Sidney lathe product line, they utilize them only to facilitate their repair parts business and they have no plans to begin manufacturing lathes. The Sherbondys never supplied repair parts to the lathe which allegedly harmed plaintiff.

The Sherbondys have never had any ownership interest in a corporation, partnership or other legal entity known as Sidney Machine Tool Company, and have never distributed products manufactured by a legal entity known as Sidney Machine Tool Company. The defendants have never possessed the physical plant, manufacturing equipment or inventories of any legal entity known as Sidney Machine Tool Company, and have never employed designers or engineers. Nor have the Sherbondys ever expressly or impliedly agreed to assume liability for lathes or other products which may have been manufactured by legal entities known as Sidney Machine Tool Company.

## ISSUE

Under these circumstances, have the Sherbondys, as a matter of law, assumed the burden of strict successor product liability?

## DISCUSSION

Plaintiff Lundell's primary reliance in the superior court and on appeal on *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3]; *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890 [159 Cal.Rptr. 119]; *Kaminski* v. *Western MacArthur Co.* (1985) 175 Cal.App.3d 445 [220 Cal.Rptr. 895]; and *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116] is misplaced. *Ray, Rawlings, Kaminski,* and *Becker* are all factually distinguishable. Moreover, the case at bench neither meets the underlying factual and theoretical premises upon which *Ray* was based, nor satisfies *Ray*'s three-prong test.

In the landmark case of *Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, the plaintiff sought recovery in strict liability for injuries suffered when he fell from a defective ladder. The manufacturer of the ladder (Alad I) had sold all of its assets on July 1, 1968, and the buyer formed a new corporation (Alad II). Plaintiff fell from the ladder on March 24, 1969, and sued Alad II. The trial court granted defendant Alad II's motion for summary judgment on the ground that it had not manufactured or sold the ladder. The Supreme Court

in reversing the judgment added a special exception to the rule governing successor liability referred to as the "product line" exception.

The *Ray* court first discussed traditional exceptions to the general rule of successor nonliability as follows: "Our discussion of the law starts with the rule ordinarily applied to the determination of whether a corporation purchasing the principal assets of another corporation assumes the other's liabilities. As typically formulated the rule states that the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. [Citations.]" (*Id.,* at p. 28.) The opinion concluded that none of these exceptions required Alad II to respond to plaintiff's claim.

The *Ray* court nonetheless justified imposing strict liability on a successor to a manufacturer of defective products, under the facts as specifically presented in that case, based on three criteria. The case at bench is factually distinguishable from *Ray,* and does not satisfy the three criteria which *Ray* required. We will proceed by examining each prong of *Ray* in light of the facts in the case at bench.

### THE FIRST PRONG OF *RAY*

The first *Ray* criterion states that the law may impose strict liability upon a successor to a manufacturer if there occurs "the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business." (*Id.,* at p. 31.) ▮▮▮ In the case at bench, 10 years elapsed between the manufacture of the last lathe by one of defendants' remote predecessors and the time defendants purchased part of the immediate predecessor's (McFadden-Sidney) assets. More to the point, the original Sidney Machine Company was sold first to the Buhr Machine Tool Company, which sold it to Summerfeld Machine Company, which, having gone out of business and liquidated its assets, was purchased by a proprietorship called McFadden Machine Company. The Sherbondys then purchased part of McFadden's assets in April 1974, operating it since as a replacement parts business. It has a single employee: John Sherbondy.

Here, three things are clear. 1) The nature of the business has changed since the Sidney Machine Company began to change hands. Though formerly a lathe manufacturing concern, it now does no manufacturing, and supplies only replacement parts for machines no newer than 1964. 2) The size of the business has also changed, having shrunk from a lathe manufacturing busi-

ness to a small, sole proprietorship supplying—but not manufacturing—parts, and employing only one person. McFadden's sale to the Sherbondys included only a portion of the assets of a business which had already diminished in size and scope. A significant portion of McFadden's assets—machine tools, production equipment, and raw materials—was not included in the sale. 3) Any "destruction of the plaintiff's remedies against the original manufacturer" was not caused by the Sherbondys' acquisition of the business, but in fact occurred long before that acquisition. The Sherbondys' proprietorship in the case at bench bears little resemblance in the size or in the nature of its business to the manufacturers of the Sidney Machine Company lathes. The multiple business entities in the chain of successors to the Sidney Machine Company have attenuated, to the vanishing point, the responsibility defendants might have borne for destroying plaintiff's remedies against the original manufacturer.

In *Ray,* by contrast, no corporate or other business entities intervened between the seller and buyer. As part of the sale, Alad I dissolved its corporate existence, and cooperated with Alad II's organization of a new corporation with the same name and owning all of the assets purchased from Alad I. Factory personnel remained the same, and Alad II employed Alad I's former general manager and principal stockholder as a paid consultant for about six months following the sale. The similarities and virtually unbroken continuities between Alad I and Alad II have been characterized as an "almost complete overlap of the corporate entities." (*Becker* v. *IRM Corp., supra,* 38 Cal.3d 454, 484, dis. opn. of Lucas, J.) The same is true of *Kaminski* v. *Western MacArthur Co., supra,* 175 Cal.App.3d 445 , and the case at bench does not resemble the facts in *Kaminski*[1] or in *Ray.*

---

[1] In *Kaminski* v. *Western MacArthur Co., supra,* 175 Cal.App.3d 445, the plaintiff was exposed at work in a shipyard to asbestos dust from products defendant's predecessor supplied. The exposure years later caused plaintiff's malignant mesothelioma. The predecessor, an asbestos distributor, suffered financial setbacks and needed operating capital urgently. Defendant-successor assumed managerial control of the predecessor "without limitation," received 50 percent of its profits, loaned it substantial sums, and eventually dissolved the predecessor and formed a new company to engage in asbestos distribution. The new successor company—the defendant—purchased $200,000 worth of inventory, $100,000 in other noncash assets, took over all outstanding and current contracts, and bought the predecessor's goodwill and customer mailing lists and records. The successor kept 45 out of 50 of the predecessor's employees, supplied the same products and services, filled orders addressed to the predecessor, and otherwise capitalized on the predecessor's reputation.

In affirming the trial court's judgment for the plaintiffs, the appeals court stressed the successor's ability as a distributor to seek indemnity against the responsible manufacturer, to negotiate with the manufacturer to share the costs of those risks, and to minimize the risk of injury by taking appropriate measures (warning labels, studies of product hazards). (*Id.,* at pp. 456-457.) The successor also acquired considerable assets of the predecessor, including customer records, goodwill, equipment, office equipment, and hundreds of thousands of dollars of inventory, and other intangible but nonetheless valuable assets such as the expertise of the 90 percent of the employees which the successor retained. Through various financial

■  The law does not automatically make a successor liable for the predecessor's defective products. (*Potlatch Corp.* v. *Superior Court* (1984) 154 Cal.App.3d 1144 [201 Cal.Rptr. 750]: Corporation, holding all shares of a dissolved subsidiary successor to the manufacturer of a defective product, not liable; *Kline* v. *Johns-Manville* (9th Cir. 1984) 745 F.2d 1217: Predecessor corporation sold product line, technical know-how, manufacturing facilities, customer lists, and exclusive rights to product trade name to successor corporation, but sale did not cause predecessor to dissolve or deprive plaintiffs of a source of recovery; successor corporation not liable.)

The successor, to be liable, must have " 'played some role in curtailing or destroying the [plaintiff's] remedies.' " (*Kaminski* v. *Western MacArthur Co., supra,* 175 Cal.App.3d 445, 458, quoting *Hall* v. *Armstrong Cork, Inc.* (1984) 103 Wn.2d 258, 265-266 [692 P.2d 787].) In *Nelson* v. *Tiffany Industries, Inc.* (9th Cir. 1985) 778 F.2d 533, for example, the Ninth Circuit found that if a predecessor's good faith, voluntary reorganization petition destroyed plaintiff's remedies, a successor later purchasing predecessor's assets in a bankruptcy, court-approved sale was not liable, unless evidence established a collusive agreement to use bankruptcy to shield successor from predecessor's liability. "*Ray* does not apply where there is a good faith dissolution in bankruptcy which is not intended to avoid future tort claims against the predecessor. Under such circumstances, the successor corporation has not contributed to or caused the destruction of the plaintiff's remedies. (*Id.,* at p. 538.)

■  In the case at bench, several ownership changes occurred—including a liquidation of assets—between the first sale of the original Sidney Machine Tool Company and defendants' purchase of a portion of the remaining assets 13 years and several owners later. The nature of the business changed from lathe manufacturing to the sale of replacement parts. And the size of the business diminished. Defendants in the case at bench played no role in causing or contributing to the destruction of plaintiff's remedies.

### THE SECOND PRONG OF RAY

*Ray* next requires "the successor's ability to assume the original manufacturer's risk-spreading role." (*Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, 31.) In

---

arrangements, the successor also "exercised complete control" of the predecessor, and after the assumption of managerial control (which included subordination of the predecessor's debts to a loan made by the successor) could have forced the predecessor into bankruptcy at any time. (*Id.,* at p. 458.) Because the transaction caused or substantially contributed to the absence of the predecessor from plaintiffs' product liability recovery pool, and to the destruction of plaintiffs' remedies against that predecessor, the appellate court affirmed the trial court's judgment.

*Ray,* the predecessor, Alad I, sold and transferred its resources to the successor, Alad II. Alad II acquired not only Alad I's plans and name, but all of its operating assets and personnel, the expertise of its former manager and principal stockholder, and its physical plant, manufacturing equipment, work in process, finished goods, and raw material inventories. In short, Alad II owned "the resources that had previously been available to Alad I for meeting its responsibilities to persons injured by defects in ladders it had produced. . . . Alad II had *virtually the same capacity* as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance or planning self-insurance. [Citation.] Moreover, the acquisition of the Alad enterprise gave Alad II the opportunity formerly enjoyed by Alad I of passing on to purchasers of new 'Alad' products the costs of meeting these risks." (*Id.,* at 33, italics added.)

■ None of these factors appears in the case at bench. Defendants' replacement-parts supply business is, as has been pointed out, not only of a different character than that of the original Sidney Machine Company, but reduced in size compared to all of its predecessor entities which intervened between itself and the Sidney Machine Company. Defendants' business, a sole proprietorship, employs one person. Defendants own no manufacturing facilities; all parts are subcontracted to machine shops. Defendants purchased their portion of McFadden for $90,000, far less than the $500,000 the complaint prays for.

It is one thing to impose risk-spreading analysis and liability upon a major corporation with valuable assets, many product lines, high volume, and great resources available to pay for insurance. It is quite another to impose risk-spreading analysis and a level of liability on a tiny sole proprietorship, which liability may exceed the proprietorship's net assets.

*Rawlings* v. *D. M. Oliver, Inc., supra,* 97 Cal.App.3d 890, 900, focused on the policy considerations underlying strict products liability, and advised against "merely counting the factors mentioned in *Alad* and giving each equal weight." "Fundmental fairness has been sought through a balancing of the rights of the injured party against the rights of those engaged in business, *including the latter's reasonable commercial expectations.* Placing the economic burden of injuries on *those best able to pay for those costs* while permitting the transfer of that burden to *those most culpable* is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed." (*Id.,* at pp. 900-901; italics added.) *Rawlings* used these three criteria to support extending strict products liability to a successor corporation which purchased a predecessor-manufacturer's business and certain of its assets, and where the defective products were not mass-produced, but manufactured to a customer's specifications and plans. (*Id.,* at p. 894.)

The case at bench, however, satisfies none of the *Rawlings* factors. First, given the length of time between the manufacture of the last lathe and the Sherbondys' purchase of the parts business, the decrease in the business' size, and the number of intervening successor business entities, it seems implausible that the Sherbondys' reasonable commercial expectations when they purchased the parts business would have included calculation of strict product liability from injuries arising from lathes manufactured 10 or more years earlier by the original Sidney Machine Tool Company. Second, as we have observed, the Sherbondys' proprietorship does not satisfy a crucial predicate for risk-spreading, i.e., the size, assets, business volume, ability to calculate risk and pay for insurance, and relationship with a manufacturer necessary to pass along the cost of such liability to present and future consumers, and to the society at large. As *Rawlings* stated, "[t]he general business continued by the manufacturer and its ability to spread those costs must be considered and not merely whether a specific line of products was discontinued." (*Id.,* at p. 901.) Third, there is no question about the absence of the Sherbondys' culpability. The Sherbondys' lack of culpability bars transferring the burden of strict products liability to them. For these reasons, and because the *Rawlings* facts differ from those of the case at bench, we do not find *Rawlings* persuasive.[2]

In short, in the instant case there is no equivalence between predecessor and successor's assets and resources. Unquestionably, the Sherbondys' business did not have its predecessors' opportunity to pass along to purchasers of new products the costs of meeting the risks of claims from defects in previously manufactured products. The existence of that opportunity is a predicate to the risk-spreading analysis and the imposition of strict products liability. We thus conclude that the second *Ray* prong fails when applied to the case at bench.

## The Third Prong of *Ray*

Strict product liability works an injustice when imposed upon a successor defendant who lacks the resources upon which it is predicated, i.e., the

---

[2]In *Rawlings* v. *D. M. Oliver, Inc., supra,* 97 Cal.App.3d 890, a predecessor manufacturer produced nine kelp dryers for Kelco to plans and specifications Kelco furnished. Seven years after installation, a coemployee turned on a kelp dryer while plaintiff cleaned it, injuring plaintiff's hand. Three months later, defendant-successor (later incorporated) purchased some of the predecessor-manufacturer's assets, including its goodwill, and continued the business at the same location, under the same fictitious name, as its predecessor. The *Rawlings* court carefully noted, in extending liability, that the defendant-successor 1) was in a position to protect itself from loss by expressly allocating, in its bargain with the sellers, the risk of liability for accidents *which happened before the sale*; 2) could transfer the economic burden to the responsible party by cross-complaining for indemnity; and 3) was in the same position as its predecessor to spread the cost of injuries among its current customers. (*Id.,* at p. 901.)

resources to pay for insurance, and the volume of business to pass along to new purchasers the risks of claims brought by purchasers of old products. The third *Ray* prong involves "the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, 31.)

In *Ray,* the successor, Alad II, had acquired Alad's trade name, good will, and customer lists. Alad II also continued to produce the very same products its successor had. Alad II further held itself out to customers as the same enterprise, a "deliberate albeit legitimate exploitation of Alad I's established reputation as a going concern manufacturing a specific product line" which "gave Alad II a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability for injuries from previously manufactured units." (*Id.,* at p. 34.)

The facts of the case at bench contrast with those of *Ray.* Defendants' business did not manufacture or sell lathes, which had not been manufactured since 1964, by another company. Defendants' business did not manufacture parts; it only sold them to customers owning existing lathes. Although the predecessor lathe-manufacturing company would have had an established reputation as a going concern manufacturing a specific product line, the defendant-successor, though it used the predecessor's name, sold different products (parts, not lathes) on a reduced scale.

In *Ray,* by contrast, overlapping corporate entities manufactured the same products and sold them to the same customers. In the case at bench the business entities did not overlap; they did not manufacture the same products; and although some customers might have been similar, that was because owners of the predecessor's lathes would naturally go to the successor to obtain parts, not because the successor continued to manufacture and sell lathes. Unlike Alad II, in the case at bench the defendants did not exploit Sidney Machine Tool Company's established reputation as a going concern manufacturing a specific product line. Because defendants did not receive the substantial benefit its predecessor enjoyed, it would be unfair to impose the burden of liability for injuries from units its predecessor manufactured.

For these reasons, we conclude that the case at bench does not satisfy *Ray's* prongs, all three of which must be satisfied before imposing products liability on a successor. (See e.g., *Jacobs* v. *Lakewood Aircraft Service, Inc.* (E.D.Pa. 1981) 512 F.Supp. 176, 182-185.) *Ray* also expressly predicated its decision and analysis on specific factual circumstances (*Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, 31), which differ from those in the case at bench.

We agree with then Associate Justice Lucas's dissent in *Becker* v. *IRM Corp., supra,* 38 Cal.3d 454, 480-481, that strict liability analysis presupposes two predicates: (1) costs of injuries resulting from defective products should be borne by manufacturers which put such products on the market (the product-*maker* is responsible for defects, not the product-consumer); and (2) retailers share liability with manufacturers as participants in a producing and marketing enterprise, because they can adjust the costs of such protection between them in the course of their continuing business relationship.

In the instant case, the injury did not result from a product defendants placed on the market. Nor is there a sufficient nexus or relationship between defendants (a distributor of parts for a predecessor-manufacturer's product), and the manufacturer (which was defunct 10 years before defendants purchased the business). Thus there can have been no possibility for the defendants and a manufacturer to have adjusted the costs of protection between them in the course of their continuing business relationship, either in the past or the future. They have had no such continuing business relationship. To impose all liability upon the defendants would contradict the logical predicates of strict liability theory. It would also work an injustice.

In sum, the mere fact that the Sherbondys conducted their proprietorship under the business name of the original manufacturer (the Sidney Machine Tool Co.), standing alone, cannot provide a basis for attaching successor liability. Reliance upon such a superficial standard would render the three-prong *Ray* test meaningless. We hold that the "circumstances here presented" (*Ray* v. *Alad, supra,* 19 Cal.3d 22, 31) do not support extending strict products liability to these defendants.

Disposition

The judgment is affirmed.

Spencer, P. J., and Devich, J., concurred.