VERN L. KRAMER, Plaintiff-Appellant, v. WEEDHOPPER OF UTAH, INC., *et al.*, Defendants (Lawrence Engineering and Supply, Inc., Third-party Plaintiff-Appellant; California Screw Products Corporation, Third-party Defendant-Appellee; Cal Space Corporation, Third-party Defendant).

First District (2nd Division)   Nos. 1—90—0009,* 1—90—0239 cons.

Opinion filed September 28, 1990.

*This part of the appeal was dismissed on June 6, 1990.

Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., of Chicago (Mark Dym and Patricia Felch, of counsel), for appellant Lawrence Engineering & Supply, Inc.

Arnstein & Lehr, of Chicago (Patrick Geary and Richard Hellerman, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Third-party plaintiff-appellant, Lawrence Engineering and Supply, Inc. (Lawrence), appeals from a summary judgment entered in favor of third-party defendant-appellee, California Screw Products Corp. (CSPC). Lawrence contends that the circuit court erred in (1) entering summary judgment without first ruling on the choice of law issue regarding whether CSPC was a successor to the liabilities of its predecessor; (2) concluding that CSPC was not a corporate successor under Illinois law; and (3) granting summary judgment when genuine issues of material fact existed as to the corporate transfers made by CSPC.

This controversy arises from the 1980 crash of an ultralight aircraft flown by Vern Kramer (Kramer). The cause of the crash was a defective AN4-33 bolt allegedly supplied to the plane's manufacturer, Weedhopper of Utah, Inc., by Lawrence. Kramer filed suit against Weedhopper and later added Lawrence as a defendant. Additional facts are set forth in our earlier opinion. 141 Ill. App. 3d 217, 490 N.E.2d 104.

On March 13, 1987, Lawrence filed a third-party complaint for contribution against an entity it identified as "California Screw, Inc." (California), and Cal Space Corporation (Cal Space), alleging that the two companies were in the business of designing, manufacturing and selling aircraft-quality nuts and bolts. The complaint stated that in August 1985, Cal Space purchased the business assets and liabilities of California and California or Cal Space, or both, were liable for defects in products they manufactured and sold prior to November 1979. Lawrence asserted that either Cal Space or California had sold the AN4-33 bolt to Lawrence, which in turn sold it to Weedhopper, which subsequently incorporated it into the kit Kramer purchased and ultimately assembled. The AN4-33 bolt allegedly was "unreasonably dangerous" and "defective."

CSPC denied the allegations and, following discovery, moved for summary judgment, pursuant to section 2—1005 of the Code of Civil

Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005), maintaining that CSPC did not sell AN4-33 bolts at the time Kramer purchased the kit in 1979 and that CSPC's predecessor, A.D. Machine Tooling (A.D.), was not in the aircraft fastener business at that time.

The affidavit and discovery deposition of Gunther Mendel were submitted into evidence, from which the following evidence was adduced. In 1961, Mendel started the Associated Machine Tool Rebuilders partnership with Andre Fernand. In 1966, they incorporated as A.D., with Mendel as the president and Fernand as the secretary-treasurer. The two men were the only shareholders and probably the only directors. Mendel served as president until 1984. The company was in the business of rebuilding and repairing machinery until 1984, when it changed its corporate name to the present CSPC.

Meanwhile, in 1981, Mendel was also an officer, a director, and a shareholder of Cal Space, another California corporation separate from A.D. Prior to 1981, Cal Space was doing business under the name California Screw Products Corporation,[1] previously identified above as California. California was incorporated in 1965, and Mendel acted as an officer, a director, and a shareholder of that corporation, too. Mendel and Fernand served as charter shareholders, with Fernand the president and Mendel the secretary-treasurer. When Alexander Goden joined the firm in 1966, he became the president, Mendel became the vice-president and Fernand became the secretary-treasurer. During its entire corporate life, California only had three shareholders.

Mendel drew separate checks from both A.D. and California. The latter had been located 20 blocks from A.D. The two firms maintained separate identities. In 1965, California made aircraft-quality fasteners, including the type of bolt allegedly involved in this lawsuit. In 1981, California changed its name to Cal Space, which continued to operate out of the same physical location as California had. In the later manufacturing stages of California, the company had manufactured only "lower grade" aircraft-quality fasteners.[2] Cal Space was not engaged in the same business, however. California previously had sold its fastener products to individual distributors. Cal Space now sold higher grade aircraft-quality fasteners directly to aircraft manufacturers, such as Boeing and McDonald Douglas. The products were not made

---

[1]The third-party complaint identifies this entity as "California Screw, Inc." Mendel testified that the name was the same as CSPC; however, it was an entirely different and independent company.

[2]"Lower grade" in this context signifies that the material used in such manufacture is a lower grade alloy.

on the same machinery, and different equipment had to be purchased. The name change was intended to reflect the higher grade of the company's product and was done for "image reasons."

In 1984, A.D. purchased Cal Space's old low tech fastener equipment, comprising 30% of Cal Space's total equipment, for $592,756. A short time later, A.D. changed its name to CSPC[3] and abandoned its machinery rebuilding business in order to focus exclusively on the fastener business. The only documentation of the sale from Cal Space to A.D. is a three-page bill detailing the transaction. Cal Space subsequently sold its remaining equipment to Deutsch Fasteners Corporation in October 1985, and the company dissolved in November 1986. Three of its former employees joined CSPC after the Deutsch sale; however, all the manufacturing personnel were kept by Deutsch. In the contract between Cal Space and Deutsch, Deutsch did not agree to assume any liabilities incurred by Cal Space.

Mendel stated that Lawrence was a customer of California in 1979 before it became Cal Space and that Lawrence purchased fasteners from California, including the AN4-33 bolt.

Following hearings on the motion, the circuit court granted the motion for summary judgment on December 13, 1989, finding no successor liability as a matter of law. Both Kramer and Lawrence filed timely notices of appeal; however, only Lawrence remains as an appellant, as this court previously granted CSPC's motion to dismiss Kramer's appeal on June 6, 1990.

## I

Lawrence initially contends that the circuit court erred by not deciding whether California or Illinois law, governing successor corporation liability, applied to the case at bar. The court ruled that it did not have to make the determination because CSPC was not a successor corporation under either State's law.

■■ Conflicts rules are applied only when a difference in law will make a difference in the outcome. (*Hartford v. Burns International Security Services, Inc.* (1988), 172 Ill. App. 3d 184, 187, 526 N.E.2d 463; *International Administrators, Inc. v. Life Insurance Co. of North America* (7th Cir. 1985), 753 F.2d 1373, 1376 n.4; see also *In re Air Crash Disaster Near Chicago, Illinois* (7th Cir. 1981), 644 F.2d 594, 605 n.2.) Since the circuit court held that CSPC was not a suc-

---

[3]There is no claim or evidence indicating that A.D. purchased the name "California Screw Products Company," predecessor to Cal Space. Nor did A.D. succeed to any of the business carried on by the entity which previously used this same name.

cessor under either State's law, the law of each State must be examined in order to determine whether the court erred in not deciding to specifically apply California or Illinois law to the case *sub judice.*

## A

■ In Illinois, a corporation which purchases the assets of another corporation generally is not liable for the debts and liabilities of the transferor in the absence of an agreement providing otherwise. (*Green v. Firestone Tire & Rubber Co.* (1984), 122 Ill. App. 3d 204, 206, 460 N.E.2d 895 (*Green*); *Freeman v. White Way Sign & Maintenance Co.* (1980), 82 Ill. App. 3d 884, 892, 403 N.E.2d 495 (*Freeman*); *Hernandez v. Johnson Press Corp.* (1979), 70 Ill. App. 3d 664, 388 N.E.2d 778 (*Hernandez*).) Exceptions to the rule include " '(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations.' " *Green*, 122 Ill. App. 3d at 209, quoting *Hernandez*, 70 Ill. App. 3d at 667.

■ The first exception is not satisfied here because the only documentation of Cal Space's equipment sale to A.D. is a three-page invoice listing which machines were included in the sale. No express liability provisions appear on the bill, and there is no evidence of any express or implied liability assumption by A.D. anywhere in the record.

■ The sale was not a consolidation or merger under the second exception because Cal Space and A.D. each continued its separate existence following the sale. See *Freeman*, 82 Ill. App. 3d at 893.

■ A *de facto* merger may be sufficient to allow the seller's liabilities to be imposed on the buyer (*Hernandez*, 70 Ill. App. 3d at 667), and may occur when the following criteria are present:

" '(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and

obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.' " *Freeman*, 82 Ill. App. 3d at 893, quoting *Hernandez*, 70 Ill. App. 3d at 667.

■■ ■ None of the requirements of a *de facto* merger are present in the case at bar. The two companies never shared physical locations, and different manufacturing employees were involved. Although CSPC purchased 30% of Cal Space's equipment, this sale of assets undisputedly was for cash and not for stock as is required by Illinois law. Furthermore, Cal Space did not cease operations until November 1986, two years after the sale of assets. (See *Gonzalez v. Rock Wool Engineering & Equipment Co.* (1983), 117 Ill. App. 3d 435, 439, 453 N.E.2d 792 (*Gonzalez*).) There is no evidence in the record that CSPC assumed the liabilities of Cal Space. As the court in *Gonzalez* noted, "it is to be expected that the purchasing corporation will continue the operations of the predecessor, but this does not by itself render the purchaser liable for the obligations of the predecessor." *Gonzalez*, 117 Ill. App. 3d at 439.

■■ Finally, the transfer cannot be considered a fraudulent attempt to escape liability since there is no record evidence that it was conducted for fraudulent reasons. Only a portion of the corporation's equipment was sold. Cal Space continued its operations for several years after that transaction and was amenable to suit from 1984 until it dissolved in 1986. Cal Space has not been shown to have had knowledge of Kramer's accident or the resulting lawsuit before 1986, which might have demonstrated a fraudulent motive in making the earlier corporate changes. Moreover, adequate consideration was given before any knowledge of the suit appears to have arisen, further evincing a nonfraudulent motive. See *Freeman*, 82 Ill. App. 3d at 893.

■■ Under Illinois law, the circuit court correctly found that no successor corporation liability was assumed from the 1984 sale of assets from Cal Space to CSPC.

### B

■■ Under California law, a purchasing corporation does not assume the selling corporation's liabilities unless one of the four exceptions noted above exists or when the purchaser buys and continues the seller's "product line." *Ray v. Alad Corp.* (1977), 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (*Ray*).

■■ In *Ray*, the plaintiff sought recovery in strict liability for injuries suffered when he fell from a defective ladder in 1969. The manufacturer of the ladder (Alad I) had sold all its assets on July 1, 1968, and

the buyer formed a new corporation (Alad II). As part of its sale, Alad I dissolved its corporate existence and cooperated with Alad II's organization of a new corporation with the same name, owning the assets purchased from Alad I. Factory personnel remained the same, and Alad II employed Alad I's former general manager and principal stockholder as a paid consultant for about six months following the sale, resulting in what a California justice later termed as an "almost complete overlap of the corporate entities." (*Becker v. IRM Corp.* (1985), 38 Cal. 3d 454, 484, 698 P.2d 116, 136, 213 Cal. Rptr. 213, 233 (Lucas, J., dissenting).) The court allowed recovery against the successor under circumstances where the successor acquired the manufacturing business and continued the output of its product line. (*Ray,* 19 Cal. 3d at 34, 560 P.2d at 11, 136 Cal. Rptr. at 581.) In creating this "product line" exception, the court recognized three primary guidelines for justifying the transfer of liability from seller to buyer, including (1) the lack of an adequate plaintiff's remedy against the seller; (2) the purchaser's access to knowledge of product risks; and (3) the transfer of good will associated with the seller's product line. (*Ray,* 19 Cal. 3d at 25, 560 P.2d at 5, 136 Cal. Rptr. at 576.) All three steps of the *Ray* analysis must be satisfied before the "product line" theory and successor liability will be imposed. *Lundell v. Sidney Machine Tool Co.* (1987), 190 Cal. App. 3d 1546, 1556, 236 Cal. Rptr. 70, 77.

None of the above factors, however, are identified in the case *sub judice.* Five years had elapsed between the time Cal Space (then California) allegedly manufactured the defective aircraft bolt and its sale of assets to A.D. By the time A.D. purchased the equipment, Cal Space was no longer in the AN4-33 bolt business, having started direct sales of higher tech bolts directly to manufacturers after 1981. These changes attenuate the responsibility A.D., and its successor, CSPC, might have borne for destroying Lawrence's remedies against the original manufacturer, California, and its successor Cal Space. (See *Lundell v. Sidney Machine Tool Co.,* 190 Cal. App. 3d at 1552, 236 Cal. Rptr. at 74.) Moreover, A.D. only purchased some of Cal Space's resources and did not acquire any of its personnel until two years later when Deutsch let them go. Finally, there is no evidence that Cal Space sold its good will and inventory as part of the sale, or agreed to dissolve its corporate existence and to assist and cooperate in the recreation of a new corporation. (See *Ray,* 19 Cal. 3d at 34, 560 P.2d at 11, 136 Cal Rptr. at 581.) As previously noted, Cal Space, at the time of the sale, no longer produced the bolt in question; therefore, CSPC could not continue a "product line." Since CSPC did not receive the substantial benefit its predecessor enjoyed, this court cannot impose upon it the burden of liability for in-

juries from bolts its predecessor allegedly manufactured. The "product line" exception, therefore, is inapplicable to the case at bar. CSPC is not liable under California's rules of successor corporate liability.

■■■ Since the outcome under either California or Illinois law is the same, the circuit court did not err in declining to formally choose which law to follow.

■■■ Assuming, *arguendo*, that the outcome would have been different under California law, Illinois law is the proper law to be applied in such a case. Successor corporate liability is determined under the choice of law provisions for products liability—traditional tort law (*Barron v. Kane & Roach, Inc.* (1979), 79 Ill. App. 3d 44, 47, 398 N.E.2d 244), and Illinois courts utilize the Restatement (Second) of Conflicts' most significant relationship test for choice of law questions concerning torts, as set forth in *Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 47, 262 N.E.2d 593.

■■■ In applying the test to the case at bar, Illinois has the most significant relationship in that the possible tort liability derives from applications of Illinois products liability law; the injury occurred in Illinois; and the relationship of all the parties is centered in Illinois. In view of the foregoing, the circuit court correctly turned to and applied Illinois law.[4]

## II

Lawrence's final contention is that the circuit court improperly granted CSPC summary judgment, arguing that several factual questions existed which preclude the grant of a summary judgment. The principles governing summary judgment procedure are well established and need not be repeated here. Ill. Rev. Stat. 1987, ch. 110, pars. 2—1005(b), (c); *Jackson Jordan, Inc. v. Leydig, Voit & Meyer* (1990), 199 Ill. App. 3d 728, 735, 557 N.E.2d 525; *Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 305, 476 N.E.2d 1259; *Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 423-24, 466 N.E.2d 1271.

■■■ At bar, the affidavits and depositions filed show that no questions of fact existed as to whether CSPC was a corporate successor to Cal Space's liabilities. CSPC denied making the AN4-33 bolt in question, and the record evidence supports this denial. CSPC also denied that it

---

[4]Lawrence asks this court to adopt the "product line" exception to Illinois case law, if it decides Illinois law must be applied. Such an invitation has been repeatedly rejected by our courts. (*Green*, 122 Ill. App. 3d at 212; *Gonzalez*, 117 Ill. App. 3d at 440; *Freeman*, 82 Ill. App. 3d at 894; *Barron v. Kane & Roach, Inc.*, 79 Ill. App. 3d at 49; *Domine v. Fulton Iron Works* (1979), 76 Ill. App. 3d 253, 257, 395 N.E.2d 19; *Hernandez*, 70 Ill. App. 3d at 669.) Moreover, as subsection B reveals, CSPC is not liable even under the *Ray* doctrine.

was in existence at the time the bolt was made, an assertion supported by the record as well. Although Lawrence insists that a genuine issue of fact existed as to whether CSPC assumed the liability of Cal Space, it filed no counteraffidavits or counterevidentiary material which supports these contentions. The circuit court, therefore, correctly determined that there was no genuine issue of material fact. (See *Shoemaker v. Rush-Presbyterian-St. Luke's Medical Center* (1989), 187 Ill. App. 3d 1040, 1043-44, 543 N.E.2d 1014.) Moreover, because CSPC could not have been found liable to Lawrence based on the theory that CSPC should assume its predecessor's liability, the circuit court's grant of summary judgment was proper. See *Nguyen v. Johnson Machine & Press Corp.* (1982), 104 Ill. App. 3d 1141, 1151, 433 N.E.2d 1104.

For the foregoing reasons, the order of the circuit court granting CSPC summary judgment must be affirmed.

Affirmed.

BILANDIC and SCARIANO, JJ., concur.